UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

Lisa Ply, individually and on behalf of A.P. and Z.P., minors,

    Plaintiff,

vs.

Andrew & Williamson Sales, Co. d/b/a Andrew & Williamson Fresh Produce,

    Defendant.

Civil Action No.:

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Lisa Ply, individually and on behalf of her minor children Z.P. and A.P., for her Complaint against the Defendant states and alleges as follows:

1. This case arises from one of the largest public health disasters in United States history.

2. In 2015, Defendant sold thousands of Mexican-grown cucumbers throughout the United States that were grossly contaminated with *Salmonella*.

3. Ultimately, Defendant's adulterated and deadly product sickened nearly 1000 people in 40 states; killed four people; and hospitalized no less than 204 people, including Plaintiff and two of her minor children.

4. Each of these individuals, including Plaintiff and her children, became sick with a specific genetic strain of *Salmonella* Poona which matched samples from the contaminated cucumbers.

5. Ultimately, Defendant caused one of the worst *Salmonella* outbreaks ever recorded in the United States.

6. Plaintiff Lisa Ply and two of her children—one of whom, A.P., was still *in utero* when sickened—were among the victims of this outbreak and continue to suffer the horrific consequences of the infections.

7. At the time of Ms. Ply's first symptoms, A.P. was only 24 weeks gestational age, and the infection caused Ms. Ply to go into preterm labor when A.P. was only 26 weeks gestational age.

8. By the time she gave birth, the *Salmonella* from Defendant's product had infected her blood and amniotic fluid—and had colonized her unborn child.

9. Through intensive and agonizing medical treatment, both mother and child survived, but only after A.P. spent over two months in the NICU where he tested positive for the outbreak strain of *Salmonella* multiple times.

10. Later, Ms. Ply's older son Z.P. also tested positive for the outbreak strain of *Salmonella* Poona and was hospitalized for several days.

11. Neither Ms. Ply nor A.P. have fully recovered from the pervasive *Salmonella* infection, and the ensuing traumatic preterm birth.

12. Ms. Ply and her family have been profoundly and permanently impacted by their infections. She therefore seeks fair compensation for all damages and losses caused by Defendant's adulterated product.

## PARTIES

13. Plaintiff Lisa Ply is currently a resident of St. George, Utah, where she lives with her minor children, including A.P. and Z.P.

14. At the time of the incidents giving rise to this complaint, Ms. Ply and her minor children were residents of the state of Minnesota.

15. Ms. Ply is the mother and natural guardian of A.P. and Z.P.

16. Defendant Andrew and Williamson Sales, Co. (hereafter "A&W") is a corporation organized and existing under the laws of the State of California with its corporate headquarters and principal place of business located in San Diego, California.

17. Upon information and belief, A&W operates a food production business under the name "Andrew & Williamson Fresh Produce" in which it sources, produces, processes, buys, imports, distributes and sells a variety of produce, including cucumbers, across the country, including in Minnesota.

## JURISDICTION AND VENUE

18. This Court has jurisdiction pursuant to 28 U.S.C. §1332(c) because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiff and Defendant.

19. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the acts and omissions giving rise to the claims asserted occurred in this district.

## FACTUAL ALLEGATIONS
### *Salmonella* Poona and the Outbreak

20. *Salmonella* is a bacterium that occurs in humans and other animals and is shed in their feces.

21. When *Salmonella* is ingested by humans, it can cause a severe form of gastroenteritis called salmonellosis. Symptoms of salmonellosis include nausea, vomiting, diarrhea, and abdominal pain. Headache, myalgia, and low-grade fever may also accompany salmonellosis.

22. Symptoms typically develop within 6 to 72 hours after contaminated food or water is ingested. Symptoms usually last for several days, but severe cases can last much longer and result in serious medical complications.

23. When severe infection occurs, *Salmonella* may spread from the intestines to the bloodstream and then to other body sites, which can result in death. Infants, pregnant women, the elderly, and those with impaired immune systems are more likely than others to develop severe acute illness.

24. Salmonellosis can also result in a variety of well-documented long-term health issues, including reactive arthritis (Reiter's syndrome), inflammatory bowel syndrome, and immunological deficiencies.

25. Reactive arthritis has long been associated with *Salmonella* infections. The symptoms associated with reactive arthritis include joint inflammation, conjunctivitis (inflammation of the eyes), and uveitis (painful urination). This triad of symptoms characterizes *Salmonella*-induced reactive arthritis, although not all three symptoms occur in all affected individuals. For some of those who contract reactive arthritis, the symptoms dissipate over the course of months or years. For others, the condition can last far longer.

26. *Salmonella* can be found in a variety of foods. Prior to the outbreak at issue in this case, fecal contamination led to multiple large-scale *Salmonella* outbreaks linked to fresh produce. Those outbreaks include a 2014 outbreak of *Salmonella* Newport associated with cucumbers that sickened at least 275 people in 29 states; a separate 2014 outbreak of *Salmonella* Saintpaul associated with cucumbers that sickened at least 84 people in 18 states; and a 2014 outbreak of *Salmonella* Enteritidis associated with bean sprouts that sickened at least 115 people in 12 states.

27. Because *Salmonella* contamination is such a well-known risk in the production of produce, particularly cucumbers, produce manufacturers have long adopted food safety measures focused on preventing *Salmonella* contamination and detecting the presence of *Salmonella* in produce.

28. A&W actively promoted and marketed its produce as safe. According to its website prior to Plaintiff's infection:

> Your safety is of utmost importance to us. **We don't delegate safety issues.** Our involvement starts at the top and then includes every member of our team. So your safety becomes part of our culture. We strive every day to earn and keep your trust and confidence!
>
> **Our safety standards are among the highest in the industry. These standards have been developed in concert with our key retail and restaurant partners so that they cover the entire supply chain from field to fork.**

29. On its website, A&W also claimed to have implemented a robust testing program:

> We routinely use testing as a way to confirm that our food safety and farming systems are working as designed. We do a lot of testing. We test the cleanliness of the water used on our farms and in our packing sheds. **We test our fields and facilities for bacteria, such as E. coli and salmonella.** We even test for pesticide residues.
>
> We use qualified, third party labs to analyze our samples. We share the results with interested parties including, governmental agencies, retailers, and restaurants.

30. Safe produce production requires produce manufacturers to adopt, implement, and follow food safety systems that include, but are not limited to, the following:

    a. The adoption of current good manufacturing practices;

    b. The implementation and enforcement of modern sanitation standard operating procedures;

    c. Current, written, validated and enforced Hazard Analysis and Critical Control Point ("HACCP") assessments and procedures;

5

    d. Training for employees on effective practices in the cultivation and harvest of produce;

    e. Testing programs designed to ensure the efficacy of sanitation and food safety policies and procedures, including, but not limited to: daily product sampling and testing; and holding product from the market pending testing results;

    f. Consultation with appropriate experts, including, but not limited to, microbiologists and sanitarians; and

    g. A system for selecting and monitoring any third-party farming and production operations, particularly when those farms are outside the United States.

31. Because of the severe health risks and the significant public health costs posed by *Salmonella*, the Centers for Disease Control ("CDC") in conjunction with state health departments actively monitor *Salmonella* cases throughout the country to identify illness-causing foods and stop outbreaks.

32. State and CDC labs routinely perform testing on *Salmonella* samples that identify the *Salmonella* bacteria's serotype and perform further genetic subtyping processes known as Pulsed-Field Gel Electrophoresis ("PFGE") and Whole Genome Sequencing ("WGS").

33. These processes, which compare DNA sequences of bacterial isolates, are then loaded into a national database called PulseNet where they are easily compared to one another, which can help identify clusters of related illnesses.

34. This system alerts the CDC when the number of *Salmonella* cases spike or when a group of *Salmonella* cases are caused by the same, or closely related, genetic strain of the bacteria. The CDC then investigates those cases as a single-source outbreak.

35. In August and early September of 2015, the CDC detected a spike in cases caused by *Salmonella* Poona, a rare serotype of *Salmonella*.

36. PFGE testing on samples from ill individuals revealed shared PFGE patterns among sickened individuals, indicating that a single food source had caused the illnesses.

37. The CDC and state health departments launched a full-scale epidemiological investigation, which included interviewing individuals infected with the outbreak strain of *Salmonella* Poona.

38. Through this process, the CDC found that 58 of the 80 people initially interviewed reported eating cucumbers in the week before their illness began.

39. The CDC identified 11 illness clusters (which the CDC defines as "two or more people who do not live in the same household who report eating at the same restaurant location, attending a common event, or shopping at the same location of a grocery store in the week before becoming ill") in seven states. Public health investigators interviewed people from every cluster. Remarkably, the results revealed that cucumbers were a food item eaten in common by ill people in every cluster.

40. Public health officials then traced the outbreak-causing cucumbers back to a common supplier, Defendant A&W.

41. Significantly, as part of the investigation, the San Diego County Health and Human Services Agency isolated *Salmonella* from cucumbers collected during a visit to a A&W facility.

42. According to the CDC, as of March 18, 2016, 907 people infected with the outbreak strains of *Salmonella* Poona had been reported from 40 states. The number of ill people reported from each state is as follows: Alabama (1), Alaska (21), Arizona (140), Arkansas (13), California (245), Colorado (21), Connecticut (1), Florida (1), Georgia(1), Hawaii (1), Idaho (27), Illinois (11), Indiana (5), Iowa (7), Kansas (2), Kentucky (1), Louisiana (5), Maryland (1),

Minnesota (46), Missouri (15), Montana (16), Nebraska (8), Nevada (17), New Hampshire (1), New Mexico (37), New York (6), North Dakota (8), Ohio (3), Oklahoma (13), Oregon (23), Pennsylvania (3), South Carolina (10), South Dakota (3), Tennessee (1), Texas (51), Utah (62), Virginia (1), Washington (26), Wisconsin (46), and Wyoming (7).

43. Illnesses started on dates ranging from July 3, 2015, to February 29, 2016. At least four people died, and 204 people were hospitalized.

44. Data from 340 focused supplemental questionnaires from people sickened with the outbreak strain in 33 states revealed that 63% (215/340) of them reported cucumber consumption in the seven days before illness onset.

45. This proportion was significantly higher than in the 2006–2007 FoodNet Population Survey, in which 47% of healthy people reported consuming cucumbers in the seven days before interview.

46. No other food item was reported significantly higher than expected when compared to the FoodNet survey.

47. Whole genome sequencing was later performed on 154 clinical isolates and 19 cucumber samples, and this testing confirmed that the isolates obtained from A&W's products and processing environment were a genetic match to the outbreak strains.

48. As of 2019, the A&W outbreak was the largest U.S. foodborne disease outbreak in the prior ten years and the third largest in the past 20 years.

49. The 2015 A&W outbreak was at least the fifth multistate outbreak caused by contaminated cucumbers since 2010.

50. Faced with the widespread contamination of its products and a mounting toll of horrifically ill people, on September 4, 2015, A&W initiated a recall of all cucumbers sold under

the "Limited Edition" brand label during the period from August 1, 2015, through September 3, 2015.

51. Upon information and belief, the outbreak-causing cucumbers were grown in Baja, Mexico and labeling on the cases of recalled cucumbers indicates the product was grown and packed by Defendant's business partner Rancho Don Juanito in Mexico.

52. The recalled cucumbers were distributed in at least the states of Alaska, Arkansas, Arizona, California, Colorado, Florida, Idaho, Illinois, Kansas, Kentucky, Louisiana, Mississippi, Minnesota, Montana, Nevada, New Jersey, New Mexico, Oklahoma, Oregon, South Carolina, Texas, and Utah and reached customers through retail, food service companies, wholesalers, and brokers.

53. Despite the recall, illnesses caused by the outbreak strain of *Salmonella* continued to be reported for many months.

### *Salmonella* Infection of Plaintiff and her Newborn Son, A.P.

54. Ms. Ply routinely ate salads containing cucumbers, including food purchased on or about September 1, 2015, from Whole Foods in Edina, Minnesota.

55. On that day, Ms. Ply purchased a hummus and cucumber tray, as well as sushi rolls containing cucumbers.

56. After consuming contaminated cucumbers produced, distributed, and sold by Defendant in early September 2015, Plaintiff became infected with an outbreak strain of *Salmonella* Poona.

57. Later genetic testing verified that the strain that sickened Plaintiff was a PFGE and WGS match to the outbreak strain. Further, this analysis also showed it matched environmental samples from Defendant A&W.

58. At the time of her infection, Ms. Ply was the mother of two children: a nine-year old daughter, and a two-year son named Z.P.

59. Both of Ms. Ply's prior pregnancies were uneventful.

60. While pregnant with her third child, A.P., she received her prenatal care at Willow Midwives and Abbott Northwestern hospital in Minneapolis. Throughout June and July of 2015, her pregnancy was assessed as normal with an estimated delivery date of January 11, 2016. Her August 19, 2015, 20-week ultrasound was completely normal.

61. The first sign of an issue occurred on September 18, 2015, at an OB-GYN evaluation for abdominal pain. At that visit, her doctor assessed Ms. Ply and believed the abdominal pain related to muscle strain or a urinary tract infection. Ms. Ply was told to follow up with her general practitioner if the symptoms persisted.

62. In the early morning hours of September 22, 2015, Ms. Ply went to the Fairview Southdale Emergency Department (ED) with chills, fever, dizziness, and worsening body aches. Her recorded temperature was 102.8, her blood pressure was dangerously low, and her white blood cell count was elevated.

63. The ED doctors prescribed Tylenol, IV fluids, a small amount of Morphine for pain and Tamiflu. These interventions improved her symptoms, and she was discharged with instructions to follow up with her midwife within 24 hours.

64. Her symptoms quickly worsened, however, and she went into the Abbott Hospital Emergency Department for follow up. By that time, Abbott had received positive blood cultures from Fairview and admitted her to the hospital on September 22, 2015 for bacteremia with unclear etiology.

65. Once there, Ms. Ply suffered a premature rupture of the membranes—in other words, her water broke at just 25 weeks pregnant—and she was beset with intermittent painful contractions.

66. Accordingly, with the fetal heart rate decreasing to alarming levels, Ms. Ply was transferred to Abbott's labor and delivery floor, "The Mother Baby Center," to more closely monitor both mother and fetus.

67. The doctors immediately started magnesium sulfate to slow or stop the contractions, along with ongoing IV antibiotics, including transplacental antibiotic treatment and erythromycin to stop preterm labor. The diagnosis at this point was *Salmonella* bacteremia with possibility of fetal infection.

68. Cultures of the amniotic fluid came back positive for *Salmonella* species on September 25, 2015. The infectious disease note from that date records a diagnosis of "*Salmonella* sepsis & chorioamnionitis." The doctors continued with the IV administration of the antibiotic ceftriaxone while ordering Ms. Ply to stay on strict bedrest.

69. Over the following days Ms. Ply remained critically ill with *Salmonella* sepsis. Her cultures continued to show *Salmonella* and, disturbingly, the fetal heart rate continued to exhibit marked decelerations. The situation remained critical as Ms. Ply fought to overcome the *Salmonella* sepsis, contractions, and constant risk of a dangerous preterm labor.

70. Through October 6, 2015, it appeared that both mother and fetus were stable but on the next day Ms. Ply experienced a dramatic increase in the intensity and frequency of contractions. Despite her doctors' best efforts, Ms. Ply went into preterm labor.

71. A.P. was delivered on October 7, 2015. His birth weight was just 1 pound 12.6 ounces.

72. Significantly, the placental pathology report noted that there was acute chorioamnionitis with associated significant maternal inflammatory response and fetal inflammatory response.

73. A sample from the amniotic fluid was tested and proved to be positive for the outbreak strain of *Salmonella* Poona.

74. Unfortunately, soon after birth, A.P.'s heart rate dropped dangerously low and he required intubation. Doctors used an umbilical arterial catheter and umbilical venous catheter to draw blood, monitor blood pressure and administer IV fluids and medication. He was transferred to the NICU.

75. While A.P. remained in the NICU, Ms. Ply continued her recovery in The Mother Baby Center. Ms. Ply was treated for significant blood loss and sepsis over the following days and remained hospitalized until October 10, 2015.

76. A.P. remained in the NICU until discharge on December 23, 2015—a total of 77 harrowing days.

77. Even at discharge, he remained "colonized" with the outbreak strain of *Salmonella* Poona. Samples taken from both his eye and stool were positive for *Salmonella*. Later PFGE testing confirmed that these samples matched the outbreak strain.

78. A.P. was discharged with a three-month prescription of antibiotics due to the *Salmonella* colonization.

79. After discharge, he required ongoing treatment for his eye and vision; head shape (plagiocephaly); and a hernia.

80. More significantly, in the years since his birth, A.P. has experienced development delays, attention disorders and other sequalae from his extreme premature birth.

81. Following her acute *Salmonella* infection, sepsis, and traumatic preterm delivery, Ms. Ply developed a well-documented gastrointestinal disorder coupled with persistent auto-immune issues, including an array of arthritis-like symptoms, fatigue, weight loss, and other symptoms.

82. After the outbreak ended, the sample taken from Ms. Ply's stool during her hospitalization was subjected to Whole Genome Sequencing—the current gold standard in genetic subtyping. This analysis verified that her sample was a match to the outbreak strain of *Salmonella* Poona, essentially identical to a sample found on a cucumber subject to the recall.

83. As a direct and proximate result of the infection caused by A&W's contaminated cucumbers, Ms. Ply sustained severe and permanent injuries. As a result, she has sustained the following past and future damages: medical, hospital, pharmaceutical and therapeutic expenses for the treatment of her injuries and those of her minor son A.P.; a loss of earnings and of earning capacity; a loss of the enjoyment and activities of life; and great physical, emotional, and mental pain.

84. As a direct and proximate result of the infection caused by A&W's contaminated cucumbers, A.P. has sustained severe and permanent injuries. As a result, A.P. has sustained the following past and future damages: medical, hospital, pharmaceutical and therapeutic expenses; a loss of earnings and of earning capacity; and great physical, emotional, and mental pain.

### *Salmonella* Infection of Z.P.

85. Shortly after finally returning home from the NICU with A.P., Plaintiff's two-year old son Z.P. became ill.

86. Starting in the middle of the night on January 24, 2016, Z.P. spiked a fever of 104.7 degrees.

87. By the morning of January 26th, he developed the telltale symptom of *Salmonella*: abdominal pain and uncontrollable diarrhea.

88. Plaintiff took him to Minnesota's Children's Hospital, where he was eventually admitted with dehydration, hypovolemia, mild hyponatremia, and diarrhea.

89. Given his known exposure to his little brother, who had been "colonized" with the outbreak strain of *Salmonella* since birth, Z.P. was immediately placed on IV antibiotics and fluids, and tested for *Salmonella* and other pathogens.

90. The test came back positive for the outbreak strain of *Salmonella* Poona, as confirmed by PFGE analysis.

91. After three days in the hospital, Z.P. was discharged on January 30, 2016.

92. As a direct and proximate result of the infection caused by A&W's contaminated cucumbers, Z.P. sustained severe injuries. As a result, Plaintiff incurred medical, hospital, pharmaceutical and therapeutic expenses; and Z.P. sustained great physical, emotional and mental pain.

## **COUNT I – STRICT PRODUCT LIABILITY – MANUFACTURING DEFECT**

93. Plaintiff incorporates the preceding paragraphs by reference as if each paragraph were set forth here.

94. Defendant A&W manufactured, processed, distributed, marketed, and sold the adulterated cucumbers that caused Ms. Ply's illness, her premature labor, the premature birth and 77-day NICU stay of A.P., the subsequent illness of Z.P., and the ongoing and life-long complications of both Plaintiff and A.P.

95. The A&W cucumbers consumed by Ms. Ply were contaminated with *Salmonella* Poona when they left the control of Defendant A&W.

96. Ms. Ply's consumption of the contaminated cucumbers caused her to become infected with *Salmonella* and to develop salmonellosis.

97. Cucumbers contaminated with *Salmonella* are dangerous if eaten and are particularly dangerous to children, pregnant women, the elderly, and anyone with a compromised immune system.

98. Because *Salmonella* is colorless and odorless, consumers like Ms. Ply have no way of detecting the contamination.

99. The A&W cucumbers purchased by Ms. Ply were contaminated with *Salmonella* and were therefore defective and unreasonably dangerous to ordinary consumers.

100. The cucumbers lacked any warning whatsoever to consumers. On the contrary, A&W promised through its marketing and promotional materials that its produce was safe.

101. A&W is strictly liable to the Ms. Ply for the harm proximately caused by the manufacture and sale of its dangerous and defective cucumbers and for its failure to warn of foreseeable risks to ordinary consumers.

102. As a result of Defendant A&W's production and sale of a defectively manufactured product and failure to warn, Plaintiff and her minor sons sustained injuries and damages set forth in the preceding paragraphs.

## **COUNT II – NEGLIGENCE**

103. Plaintiff incorporates the preceding paragraphs by reference as if each paragraph were set forth here.

104. A&W manufactured, processed, distributed, marketed, and sold cucumbers that were contaminated with *Salmonella*, a deadly pathogen.

105. A&W owed a duty to all persons who consumed its products, including Ms. Ply, to manufacture and sell cucumbers that were safe to eat, that were not adulterated with deadly

pathogens like *Salmonella*, and that were not produced in violation of applicable food safety regulations and industry standards.

106.     A&W breached the duties owed to the consumers of its cucumbers by committing the following negligent acts and omissions:

   a. Failing to adequately maintain and monitor the safety of its products, premises, equipment and employees;

   b. Failing to properly monitor and operate its farming operations, packing facilities and equipment in a safe, clean, and sanitary manner;

   c. Failing to adopt, implement, and follow adequate food safety policies and procedures;

   d. Failing to apply its food safety policies and procedures to ensure the safety and sanitary conditions of its food products, premises, and employees;

   e. Failing to adopt, implement, and validate food safety policies and procedures that met industry standards for the safe and sanitary production of produce;

   f. Failing to prevent the transmission of *Salmonella* to consumers of its cucumbers;

   g. Failing to properly train its employees and agents how to prevent the transmission of *Salmonella*;

   h. Failing to properly supervise its employees and agents to prevent the transmission of *Salmonella*;

   i. Failing to adequately test its fields, processing facilities, and cucumbers for microbial pathogens, including *Salmonella*; and

   j. Other acts and omissions as revealed through discovery.

107.     Ms. Ply's injuries, and those of her minor children A.P. and Z.P., are a direct and proximate result of the negligence of Defendant A&W.

108.     As a result of Defendant A&W's negligence, Ms. Ply and her minor sons sustained the injuries and damages set forth in the preceding paragraphs.

## COUNT III – NEGLIGENCE *PER SE* (MINN. STAT. § 31.02)

109. Plaintiff incorporates the preceding paragraphs by reference as if each paragraph were set forth here.

110. Defendant A&W, its employees, agents, or those working on its behalf, as providers of food products within the State of Minnesota, owe a duty to comply with Minn. Stat. Chapter 31.

111. Minnesota Food Law, Minn. Stat. § 31.02 *et seq.*, prohibits:

   a. The manufacture, sale, or delivery, holding or offering for sale of any food that is adulterated or misbranded;

   b. The adulteration or misbranding of any food;

   c. The receipt in commerce of any food that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise.

112. A&W, its employees, agents, or those working on its behalf, failed to comply with Minn. Stat. Chapter 31. Such conduct constitutes negligence *per se*.

113. As a result of the failure of Defendant A&W, its employees, agents, or those working on its behalf, to comply with Minn. Stat. Chapter 31, Ms. Ply and her minor sons sustained damages as set forth in the preceding paragraphs.

## COUNT IV – NEGLIGENCE PER SE (21 U.S.C. § 331)

114. Plaintiff incorporates the preceding paragraphs by reference as if each paragraph were set forth here.

115. Defendant A&W, its employees, agents, or those working on its behalf, as providers of food products in the United States of America, owe a duty to comply with 21 U.S.C. § 331, which states:

   The following acts and the causing thereof are prohibited:

      a. The introduction or delivery for introduction into interstate commerce of any food that is adulterated;

      b. The receipt in interstate commerce of any food that is adulterated, and the delivery or proffered delivery thereof for pay or otherwise….

116.    A&W, its employees, agents, or those working on its behalf, failed to comply with U.S.C. § 331. Such conduct constitutes negligence *per se*.

117.    As a result of the failure of Defendant A&W, its employees, agents, or those working on its behalf, to comply with 21 U.S.C. § 331, Ms. Ply and her minor sons sustained damages as set forth in the preceding paragraphs.

## COUNT V – BREACH OF IMPLIED WARRANTY

118.    Plaintiff incorporates the preceding paragraphs by reference as if each paragraph were set forth here.

119.    The cucumbers produced, distributed and sold by A&W that caused Ms. Ply's illness were adulterated with *Salmonella* and were in a defective condition unreasonably dangerous to ordinary consumers and members of the public when they left A&W's control.

120.    A&W violated Minnesota Statutes § 336.2-314 because its goods: (a) would not pass without objection in the trade under the contract description; (b) were not of fair average quality within the description; and (c) were not fit for the ordinary purposes for which such goods are used: human consumption.

121.    Ms. Ply's injuries are a direct and proximate result of A&W's breach of implied warranties, and the Plaintiff is entitled to recover for all actual, consequential, and incidental damages that flow directly and in a foreseeable fashion from these breaches.

122.    As a direct result of Defendant A&W's breach of its implied warranties, Ms. Ply and her minor sons suffered the injuries and damages set forth in the preceding paragraphs.

## RELIEF REQEUSTED

**WHEREFORE**, Plaintiff prays judgment against the Defendant in an amount far greater than Seventy-Five Thousand Dollars ($75,000.00) together with pre- and post-judgment interest, costs, and disbursements incurred herein and such other relief as the court may find just and equitable.

## JURY DEMAND

Plaintiff hereby demands a jury trial.


Dated:      7/15/22                              Respectfully submitted,

_____
Brendan J. Flaherty (MN# 0327657)
OFT Law PLLC
730 2nd Avenue South, Suite 810
Minneapolis, MN 55402
Telephone:  612-268-0383
Email: brendan@oftlaw.com

Bart B. Torvik (IL# 6302166)
OFT Law PLLC
701 Main St. #204
Evanston, IL 60202
Telephone: 312-212-8479
Email: bart@oftlaw.com

*Attorneys for Plaintiffs*